UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X         Civ. Case No:

JANE DOE,

                                        Plaintiff,                    **COMPLAINT**

                          -against-

THE CRIME REPORT,
THE CENTER ON MEDIA, CRIME AND JUSTICE
(CMCJ) AT THE JOHN JAY COLLEGE OF CRIMINAL JUSTICE,
CITY UNIVERSITY OF NEW YORK d/b/a JOHN JAY
COLLEGE OF CRIMINAL JUSTICE,
AUXILIARY SERVICES CORPORATION, INC.
STEPHEN HANDELMAN, individually, GABRIELA LEAL, individually,
RAJ SINGH, individually, and RESEARCH FOUNDATION OF THE
CITY UNIVERSITY OF NEW YORK,

                                        Defendants.

-------------------------------------------------------------------X

To the above-named Defendants:

        Plaintiff, JANE DOE (hereinafter "Plaintiff" by and through her attorneys, DEREK

SMITH LAW GROUP, PLLC, files this complaint against Defendants upon information and

belief as follows:


                          **NATURE OF CASE**

        1.        Plaintiff complaints pursuant to, *inter alia*, discrimination on the basis of sex/gender

in employment in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §1681

et seq. ("Title IX"); the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution ("Equal Protection Clause") and 42 U.S.C. § 1983; 18 U.S.C. § 1591 and 1595, also

known as the Trafficking Victims Protection Reauthorization Act ("TVPA"), New York State Human

Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").; Adult Survivors Act under CPLR §214-j; N.Y. ADC. LAW § 8-903 "Gender Motivated Violence Act"; and New York state common law seeking damages to redress the injuries Plaintiff has suffered as a result of *quid pro quo* sexual harassment, sexual harassment, discrimination, retaliation, and constructive discharge on the basis of gender and sex as well as assault, battery, negligent infliction of emotional distress, and intentional infliction of emotional distress.

## PRELIMINARY STATEMENT

2.      This is a case about a woman who was abused, exploited, and was turned into a sexual play toy for her boss. Defendant STEPHEN HANDELMAN (hereinafter also referred to as "HANDELMAN") abused his position as Plaintiff's supervisor to sexually exploit Plaintiff and damage her career. Initially, after Defendant STEPHEN HANDELMAN began working closely with Plaintiff, he sexually pursued Plaintiff making Plaintiff feel uncomfortable and obligated to comply with his sexual advances. Defendant STEPHEN HANDELMAN continued to sexually pursue Plaintiff and due to his persistence and position of power, Plaintiff began to yield to his sexual advances and on certain occasions fully consented to the sexual advances. Around fall of 2018, Plaintiff ceased having any sexual contact with Defendant STEPHEN HANDELMAN. Immediately thereafter, Defendant STEPHEN HANDELMAN became angry with Plaintiff and retaliated against Plaintiff by, *inter alia*, degrading Plaintiff at work, overly criticizing Plaintiff, insulting Plaintiff, finding fault in Plaintiff's work performance where no fault existed, and refusing to advance Plaintiff's career as he had done when Plaintiff was sexual with him. Defendant has created a hostile work environment for Plaintiff.

3.      In the Spring of 2019, Plaintiff filed a formal complaint with Defendants' Title IX office. Defendants failed to properly investigate Plaintiff's complaints and Defendants failed to protect Plaintiff from further retaliation by Defendant STEPHEN HANDELMAN. Plaintiff informed Defendants that Defendant STEPHEN HANDELMAN violated the no-contact order. Defendants failed to take any remedial measures and continued to allow Defendant STEPHEN HANDELMAN to contact Plaintiff.

4.      Plaintiff was constructively discharged because Defendants failed to properly investigate Plaintiff's claims and protect Plaintiff from further harassment and retaliation.

5.      Plaintiff is so distraught from the sexual discrimination, harassment, and retaliation that she is unable to eat, sleep, and suffers from severe anxiety and depression including suicidal thoughts and tendencies.

## JURISDICTION

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title IX and Section 1983. The Court has supplemental jurisdiction over Plaintiff's related claims arising under New York State and New York City law pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in this district based upon Defendants' principal place of business is located in the Southern District of New York at 524 West 59th Street, New York, New York 10119 and the events comprising the causes of action occurred within the Southern District of New York pursuant to 28 U.S.C. §1391(b).

## PARTIES

8.     Plaintiff JANE DOE is a 27 year-old woman who currently maintains her residence in and is a citizen of the State of Hawaii. At all times material, Plaintiff was employed by Defendants.

9.     At all times material, Plaintiff worked for Defendants as Defendant HANDELMAN'S Intern, Special Project Manager, and Assistant.

10.     At all times material, Defendant STEPHEN HANDELMAN ("HANDELMAN") is a 74 year-old male residing in the State and City of New York.

11.     At all times material, Defendant HANDELMAN is the Editor-in-Chief of The Crime Report.

12.     At all times material, Defendant HANDELMAN serves as Director of the Center on Media, Crime and Justice at John Jay College of Criminal Justice.

13.     At all times material, Defendant HANDELMAN held supervisory authority over Plaintiff.

14.     According to its website Defendant THE CRIME REPORT is a nonprofit multimedia information and networking resource based at John Jay College of Criminal Justice in New York.

15.     Defendant THE CENTER ON MEDIA, CRIME AND JUSTICE (CMCJ) AT THE JOHN JAY COLLEGE OF CRIMINAL JUSTICE is a branch of the CITY UNIVERSITY OF NEW YORK.

16.     Defendant, the CITY UNIVERSITY OF NEW YORK d/b/a JOHN JAY COLLEGE OF CRIMINAL JUSTICE is a public university formed pursuant to the laws of the State of New York. CUNY's principle place of business is in New York County, New York.

17.     Defendant JOHN JAY COLLEGE OF CRIMINAL JUSTICE AUXILIARY SERVICES CORPORATION, INC. is a Domestic Not for Profit Corporation duly existing under the laws of the State of New York.

18.     According to their website, Defendant THE CRIME REPORT (TCR) is the nation's only comprehensive news service covering the diverse challenges and issues of 21st century criminal justice in the U.S. and abroad. Staffed by working journalists in New York, Washington, and Los Angeles, it is published daily through the year by the Center on Media, Crime and Justice at the John Jay College of Criminal Justice in New York. TCR's prizewinning coverage includes investigative reports by the some of the nation's most accomplished reporters; analysis, blogs and commentary by leading criminologists, practitioners, law enforcement/corrections professionals, and legal experts; reports on new and cutting-edge research; and daily summaries of the most important criminal justice news, issues and developments covered by the national and international press.

19.     At all times material, Defendant GABRIELA LEAL was and is the Title IX Coordinator for John Jay College.

20.     At all times material Defendant LEAL had supervisory authority over Plaintiff.

21.     At all times material, Defendant RAJ SINGH was and is the Vice President of Administration and human resources.

22.     At all times material, Defendant SINGH had supervisory authority over Plaintiff.

**MATERIAL FACTS**

23.     Around Fall of 2017, Plaintiff moved to New York City with no friends or family and began an unpaid internship with Defendants at The Crime Report, an online newspaper for John Jay College. Plaintiff saw this internship as an opportunity for the beginning of a long, successful career

in the journalism industry. Plaintiff's responsibilities included:  researching and writing in-depth stories for daily publications, as well as working with a team of editors to turn stories.

24.     During the first few months of Plaintiff's internship, Plaintiff and Defendant HANDELMAN quickly developed a friendship. Plaintiff admired Defendant HANDELMAN as the Editor in Chief of The Crime Report, a writer, and a journalist that she began to look to him for guidance and support.

25.     Plaintiff and Defendant HANDELMAN began working together on a domestic violence panel which required long hours.  Plaintiff and Defendant often communicated until early hours in the morning.

26.     During the winter of 2017, Plaintiff, in a trusting and admirable way, confided in Defendant HANDELMAN that she had been sexually assaulted in college, and asked Defendant HANDELMAN to edit a personal essay she had written, in hopes of her first publication in a national magazine.

27.     The next day, Defendant HANDELMAN asked Plaintiff to go out for coffee. Plaintiff accepted the invitation, assuming the meeting would pertain to work matters.

28.     Instead, Defendant HANDELMAN revisited Plaintiff's sexual assault in college and spoke personally of his family and friends.

29.     The following week, Defendant HANDELMAN asked Plaintiff to dinner. Plaintiff accepted. Again, assuming dinner would pertain to work matters.

30.     Around that same time, between November and December, 2017, Defendant HANDELMAN promoted Plaintiff to a paid, part-time journalist position.

31.     Defendant HANDELMAN then asked Plaintiff to dinner a second time.  This time, at a restaurant near Defendant's apartment on the Upper West Side.  During dinner, Defendant

HANDELMAN playfully threw his napkin at Plaintiff and flirted with Plaintiff.  That night, Defendant HANDELMAN kissed Plaintiff on the cheek and placed his hand on Plaintiff's lower back as Plaintiff got on the train to go home. Defendant HANDELMAN's unwelcomed sexual conduct made Plaintiff extremely uncomfortable.

32.     At this time, Defendant HANDELMAN was 70 years old and Plaintiff was 22 years old.

33.     That next week, Plaintiff did not return to work.  Plaintiff was nervous and afraid to encounter Defendant HANDELMAN.  Ultimately, Plaintiff returned to work and talked herself out of the anxiety she felt.  After all, Plaintiff thought of them as friends.

34.     Upon returning to work, the work relationship continued as normal, but Defendant HANDELMAN continued to ask Plaintiff to have dinner with him.

35.     Between January and March 2018, Defendant HANDELMAN repeatedly made unwanted and increasingly more aggressive sexual advances towards Plaintiff.

36.     By way of example only, on one occasion, after dinner, Defendant HANDELMAN put his arms on Plaintiff's shoulders in an attempt to kiss Plaintiff, but Plaintiff was able to escape Defendant HANDELMAN's unwanted sexual advance.

37.     On another occasion while in Defendant HANDELMAN's office, Defendant HANDELMAN told Plaintiff that his son was caught watching pornography at a sleepover. Defendant HANDELMAN said "we've all [watched pornography]..I'm sure you've done it as well." Defendant HANDELMAN told Plaintiff we all have to search for our sexuality.

38.     On another occasion, while having dinner at The Plaza, Defendant HANDELMAN asked Plaintiff "have you ever been with another woman or thought about it?" Defendant HANDELMAN bragged about his sexual exploits stating "I've done it all" and that when he was

younger, he was "sexually curious with another young girl and a young boy and they were all penetrating and it felt so good."

39.     On another occasion, around May 24, 2018, Defendant HANDELMAN asked to have dinner with Plaintiff in her neighborhood.  After faking sick a few times, Plaintiff reluctantly agreed. When Defendant HANDELMAN arrived, he immediately put his arm around Plaintiff's shoulder. Then while walking through the park towards the restaurant, Defendant HANDELMAN began to pick flowers for Plaintiff. Plaintiff felt disgusted and expressed no interest in Defendant HANDELMAN's sexual advances.

40.     That night, after dinner Defendant HANDELMAN was intoxicated and would not go home. Defendant HANDELMAN walked Plaintiff home and proceeded to enter her apartment lobby. While sitting on the couch in Plaintiff's apartment lobby, Defendant HANDELMAN said "it would feel so good to go to bed with you."   Plaintiff anxiously called Defendant HANDELMAN an uber and told him to get in it.

41.     It should have been obvious to Defendant HANDELMAN that Plaintiff did not want a sexual relationship with him. However, despite this clear refusal to engage in sexual relations with Defendant HANDELMAN, he continued his campaign to have sexual relations with his employee, Plaintiff.

42.     On one occasion, while at Hotel Des Artistes, Defendant HANDELMAN told Plaintiff about the problems in his marriage and that he and his wife cheated on another.

43.     Defendant HANDELMAN offered to pay Plaintiff's rent.

44.     Around this same time, Defendant HANDELMAN promoted Plaintiff to a paid, full-time journalist position.

45.     Around June 12, 2018, Plaintiff accompanied Defendant HANDELMAN on a business trip to Washington, D.C. Plaintiff made sure to email Defendant HANDELMAN for reassurance separate rooms were booked.

46.     Once in Washington, D.C., after dinner one night, Defendant HANDELMAN told Plaintiff that he was in love with her and kissed Plaintiff on the lips.

47.     Defendant HANDELMAN then went into Plaintiff's hotel room, laid on Plaintiff's hotel bed holding two glasses of wine.  Plaintiff wanted Defendant HANDELMAN to leave but she did not want to make him angry. Reluctantly, Plaintiff kissed Defendant HANDELMAN and Defendant HANDELMAN performed sexual act on Plaintiff.

48.     The next day, while reporting on Harvey Weinstein and Bill Cosby cases Defendant HANDELMAN told Plaintiff that the night before was what they both wanted but after Plaintiff gave Defendant HANDELMAN a look he said, "I'm going to leave you alone for a while."

49.     However, during the summer of 2018, Plaintiff and Defendant HANDELMAN have an affair, performing sexual acts on each other and having sexual intercourse.

50.     Around July 2018, Defendant HANDELMAN told Plaintiff that she needed to touch him and ran Plaintiff's hand down his body.

51.     At that same time, Defendant HANDELMAN rejected Plaintiff's pleas to end the affair multiple times. Defendant HANDELMAN told Plaintiff that it felt too good to end it.

52.     Defendant HANDELMAN would not accept the end of the relationship and made Plaintiff fearful of losing her job and reputation she worked so hard to obtain if she stopped engaging in sexual acts with him.

53.     At this same time, Defendant HANDELMAN not only gave Plaintiff a raise but told Plaintiff that he was going to advance her career by showing Plaintiff's work to his

connections at Time and New York Times and introducing Plaintiff to his contacts. By way of example, on one occasion Defendant HANDELMAN introduced Plaintiff to a reporter at the Huffington Post.

54.     Finally, around late August 2018, Plaintiff gained the courage to finally end the relationship despite the fear of losing her job. Defendant HANDELMAN told Plaintiff that if she went to Human Resources it would ruin his life, his family, and career.

55.     Plaintiff then began working remotely to avoid any interaction with Defendant HANDELMAN.

56.     However, Defendant HANDELMAN again asked to go to Plaintiff's neighborhood for dinner. Plaintiff rejected Defendant HANDELMAN's invitation.

57.     During the Winter 2018 and Spring 2019, Defendant HANDELMAN became extremely angry and would not accept the ending of the relationship.

58.     Defendant HANDELMAN began to incessantly text and call Plaintiff, hounding and harassing Plaintiff especially on the weekends which he had never done before Plaintiff ended the relationship.

59.     Defendant HANDELMAN also told Plaintiff she had to come in the office more and work less remotely.

60.     Around April 1, 2019, Plaintiff confronted Defendant HANDELMAN for sexually assaulting and sexually harassing Plaintiff. Defendant HANDELMAN admitted that it was wrong for Defendant HANDELMAN to use his authority and power over Plaintiff but that he had to deny it was sexual harassment. Defendant HANDELMAN also denied kissing Plaintiff on the cheek was sexual harassment because he would do it to a woman, he would meet for the first time.

61.     When Plaintiff told Defendant HANDELMAN that she intended on filing a complaint with human resources Defendant HANDELMAN retaliated against Plaintiff by telling Plaintiff that everyone would lose their job because of her.

62.     Unable to deal with Defendant HANDELMAN's harassment, Plaintiff reported Defendant HANDELMAN's behavior to Human Resources.  Defendants opened an investigation and both Plaintiff and Defendant HANDELMAN signed a no-contact order.

63.     Despite the no-contact order, Defendant HANDELMAN continued to contact Plaintiff until around June 3, 2019. Defendant HANDELMAN continued to have contact with Plaintiff making her extremely uncomfortable.

64.     Between April 1, 2019 and June 3, 2019, Plaintiff informed Defendants SINGH and LEAL  of Defendant HANDELMAN's multiple violations of the no-contact order to no avail.

65.     Around June 3, 2019, Plaintiff sent a written complaint to Defendant Leal and Defendant Singh reminding Defendants of her previously filed complaints that Defendant HANDELMAN was not abiding by the no-contact order and again that morning Defendant HANDELMAN contacted Plaintiff. Plaintiff complained of retaliation.

66.     Around June 6, 2019, Defendants' failure to take remedial measures, retaliatory treatment and discrimination against Plaintiff made Plaintiff overwhelmed, anxious, afraid, and unstable. Plaintiff could no longer work under those conditions.

67.     As a result, around late June 6, 2019, Defendants constructively terminated Plaintiff.

68.     To date, Plaintiff has not received any investigation findings from Defendants.

69.     Defendants' conduct created an abusive and unhealthy work environment for Plaintiff.

70.     The aforementioned conduct by Defendants unreasonably interfered with Plaintiff's work environment.

71.     Defendants engaged in a pattern and practice of permitting, condoning, and even encouraging the above type of illegal behavior.

72.     The above are only some of the instances of harassment, discrimination, and retaliation to which defendants subjected Plaintiff.

73.     Plaintiff was subjected to instances of sexual assault, sexual harassment, discrimination, and a hostile work environment on a continual, pervasive, frequent and ongoing basis.

74.     Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

75.     Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

76.     Plaintiff claims unlawful constructive and/or unlawful actual discharge and also seeks reinstatement.

77.     Plaintiff claims alternatively (in the event Defendants claim so or that the Court determines) that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors. Furthermore, in such case, Plaintiff claims that Defendants owed and breach its duty to Plaintiff to prevent the harassment, discrimination, retaliation and is liable therefore for negligence.

78.     The above are only some examples of the types of unlawful and sexual conduct to which Defendants subjected Plaintiff.

**AS A FIRST CAUSE OF ACTION**

## FOR VIOLATIONS OF TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972, 20 U.S.C. § 1681 ET SEQ.
### (Against Defendant CUNY)

79.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

80.     Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be … subject to discrimination under any education program or activity receiving Federal financial assistance."

81.     By the above described conduct, Plaintiff was discriminated against on the basis of her sex/gender at Defendant CUNY, including but not limited to by sexual harassment and sexual assaults by Defendant HANDELMAN.

82.     Defendant CUNY was on notice of the discriminatory conduct engaged in by faculty at John Jay. Defendant CUNY failed to carry out its duties and obligations pursuant to Title IX to investigate and take corrective action.

83.     Defendant CUNY allowed and perpetuated an educational environment in which discriminatory and harassing practices that were, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive and retaliatory.

84.     Defendant CUNY tolerated, condoned, ratified and/or engaged in the sexually abusive educational environment, or, in the alternative, knew, or should have known, of its existence, yet failed to conduct proper investigation and failed to take remedial action.

85.     As a direct and proximate result of Defendant CUNY's unlawful actions or inactions, Plaintiff has suffered, and will continue to suffer, harm, including, but not limited to, loss of future educational and employment opportunities, humiliation, embarrassment, reputational

harm, emotional and physical distress, mental anguish and other economic damages and non-economic damages.

86.     Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

**AS A SECOND CAUSE OF ACTION**
**FOR RETALIATION OF TITLE IX OF THE EDUCATION**
**AMENDMENTS ACT OF 1972, 20 U.S.C. § 1681 ET SEQ.**
**<u>(Against Defendant CUNY)</u>**

87.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

88.     Defendant CUNY retaliated against Plaintiff in violation of Title IX by, inter alia, failing to properly investigate Plaintiff's claims of discrimination, sexual assault, sexual harassment, and retaliation and allowing Defendant HANDELMAN to continue violating the no-contact order.

89.     As a direct and proximate result of Defendant CUNY's unlawful conduct in violation of Title IX, Plaintiff suffered, and continues to suffer, harm for which she is entitled to an award of damages to the greatest extent permitted by law, including, but not limited to, monetary and/or economic harm, for which she is entitled to an award of monetary damages.

90.     As a direct and proximate result of Defendant CUNY's unlawful actions Plaintiff has suffered, and will continue to suffer, harm, including, but not limited to, loss of future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish and other economic damages and noneconomic damages.

91.     Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, attorneys' fees and costs and other appropriate relief.

**AS A THIRD CAUSE OF ACTION**
**FOR VIOLATIONS OF EQUAL PROTECTION CLAUSE**
**42 U.S.C. § 1983**

92.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

93.     Plaintiff claims Defendants violated 42 U.S.C. § 1983, which states in pertinent part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

94.     The Fourteenth Amendment of the United States Constitution states in relevant part that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

95.     Plaintiff is an individual whom Defendants denied equal protection of the laws by discriminating against on the basis of Plaintiff's sex/gender.

96.     Defendant's discrimination based the above protected class is not substantially related to a sufficiently important governmental interest.

97.     Defendants further deprived Plaintiff of the right to life, liberty, and equal protection of the laws.

98.     Each of the Defendants violated the Plaintiff's constitutional rights as set forth herein, including but not limited to depriving Plaintiff of equal protection of the laws.

99.     Defendants violated the above section as set forth herein.

100.    The individual governmental defendants are being sued herein in their individual and official capacities.

101.    Defendants further engaged in an unlawful discriminatory custom, procedure and/or practice of unlawful discrimination as set forth herein.

102.    Plaintiff's protected characteristics were a determinative or motivating factor in Defendants' employment actions.

103.    Defendants acted under color of state law.

104.    Defendants acted with the intent to discriminate.

105.    Defendants acted upon a continuing course of conduct.

106.    Moreover, this case unquestionably involves official policy: Defendants and its policymaking officials, the individual Defendants, (1) directed that the violations occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

107.    Defendants acted with malice or reckless indifference to Plaintiff's federally protected rights and as a result there should be an award of punitive damages against Defendants.

108.    As a result of Defendants' violations of Plaintiff's Equal Protection rights, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

### AS A FOURTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER STATE LAW

109.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

110.    Executive Law § 296 provides that   1. (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

111.    Defendant engaged in an unlawful discriminatory practice by otherwise discriminating against the Plaintiff because of Plaintiff's sex.

### AS A FIFTH CAUSE OF ACTION
### FOR RETALIATION UNDER STATE LAW

112.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

113.    New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

17

114.    Defendants engaged in an unlawful discriminatory practice by retaliating, and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Defendants.

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

115.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

116.    New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

117.    Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct outlined the above discriminatory, unlawful and retaliatory conduct.

## AS A SEVENTH CAUSE OF ACTION
## ASSAULT & BATTERY

118.    Plaintiff repeats and realleges each and every allegation made in this complaint as if they were set forth herein fully at length.

119.    That the aforesaid occurrences and resultant injuries to Plaintiff were caused by reason of the intent, carelessness and recklessness of Defendant in suddenly and without provocation Defendant HANDELMAN did physically assault and batter Plaintiff herein causing Plaintiff to sustain damages; in that Defendant did conduct himself in a wanton, willful, reckless and heedless manner without regard to the safety of the Plaintiff herein; in that said Defendant was physically abusive; in behaving in a disorderly manner; in using unnecessary, excessive and

unlawful touching against the plaintiff; in willfully and maliciously assaulting and battering the Plaintiff herein.

120.    As a result of Defendant's acts of assault and battery, Plaintiff has been damaged in an amount to be determined at the time of trial.

## AS AN EIGHTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

121.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

122.    The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

123.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of Plaintiff's gender, sexual harassment and hostile work environment.

124.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

## AS A NINTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

125.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

126.    The New York City Administrative Code Tide 8, §8-107(1) (e) provides that it shall be unlawful discriminatory practice: "For an employer... , to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

127.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

**AS A TENTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**

128.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

129.    The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

130.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

**AS AN ELEVENTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER THE**
**NEW YORK CITY ADMINISTRATIVE CODE**

131.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

132.    Section 8-107(19), Entitled Interference with Protected Rights provides that: "It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or

interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section."

133.    Defendants violated the above section as set forth herein.

**AS A TWELFTH CAUSE OF ACTION
FOR DISCRIMINATION UNDER THE
NEW YORK CITY ADMINISTRATIVE CODE SUPERVISORY LIABILITY**

134.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

135.    Section 8-107(13) entitled Employer liability for discriminatory conduct by employee, agent or independent contractor provides:

a.      An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

i.       The employee or agent exercised managerial or supervisory responsibility; or

ii. The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

iii. The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

136.    Defendants violated the above section as set forth herein.

## AS A THIRTEENTH CAUSE OF ACTION
## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

137.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

138.    Defendant HANDELMAN's actions were intentional and/or reckless.

139.    Defendant HANDELMAN's conduct was extreme and outrageous.

140.    As a result of said actions and conduct, Plaintiff has suffered and continues to suffer from severe emotional distress.

## AS A FOURTEENTH CAUSE OF ACTION
## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

141.    Plaintiff repeats and re-alleges each and every allegation made in the complaint as if they were set forth herein fully at length.

142.    Defendant's behavior was extreme and outrageous to such extent that the action was atrocious and intolerable in a civilized society.

143.    Defendant had a duty of care to Plaintiff to not assault her.

144.    Defendant violated that duty.

145.    Defendant's breach of duty caused Plaintiff to suffer numerous injuries as set forth herein.

146.    As a result of Defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

## AS A FIFTEENTH CAUSE OF ACTION

**FOR VIOLATIONS OF THE**
**GENDER MOTIVATED VIOLENCE PROTECTION ACT**

147.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

148.    N.Y. ADC. LAW § 8-903 states in relevant part "For purposes of this chapter:

a. "Crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

b. "Crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

149.    N.Y. ADC. LAW § 8-904 : NY Code–Section 8-904: Civil Cause of Action states in relevant part "Except as otherwise provided by law, any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903 of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction for any or all of the following relief:

1. compensatory and punitive damages;

2. injunctive and declaratory relief;

3. attorneys' fees and costs;

4. such other relief as a court may deem appropriate."

150.    Defendant HANDELMAN's conduct constitutes crimes of "violence motivated by gender" under The Victims of Gender-Motivated Violence Protection Act ("VGMVPA").

151.    As a result of defendant's acts, Plaintiff has been damaged in an amount to be determined at the time of trial.

### AS A SIXTEENTH CAUSE OF ACTION
### UNDER THE ADULT SURVIVOR'S ACT CPLR § 214-j
### (AGAINST ALL DEFENDANTS)

152.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint. CPLR § 214-j. Certain sexual offense actions. Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older, or incest as defined in section 255.26 or 255.27 of the penal law committed against such person who was eighteen years of age or older, which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section. In any such claim or action, dismissal of a previous action, ordered before the effective date of this section, on grounds that such previous action was time barred, and/or for failure of a party to file a notice of claim or a notice of intention to file a claim, shall not be grounds for dismissal of a revival action pursuant to this section.

153.    Defendants violated the sections cited herein as set forth and Plaintiff suffered numerous damages as a result.

### AS A SEVENTEENTH CAUSE OF ACTION
### TRAFFICKING VICTIMS PROTECTION ACT (TVPA)
### 18 U.S.C. § 1591 and 1595

154.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

155.    Plaintiff brings this claim pursuant to all applicable sections of 18 U.S.C.A. §§ 1591, 1595 in that "An individual who is a victim of a violation of Section 1589, 1590, or 1591 of title 18, United States Code, may bring a civil action in any appropriate district court of the United States. The court may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." 18 U.S.C.A. §1595(a).

156.    18 U.S.C. 1591, entitled "Sex trafficking of children or by force, fraud, or coercion," states:

a. Whoever knowingly—

    i. in or affecting interstate or foreign commerce [...] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

    ii. benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)

b. knowing, [...] that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act [...].

c. The term "coercion" means—

    i. threats of serious harm to or physical restraint against any person;

    ii.   any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or

    iii.   the abuse or threatened abuse of law or the legal process.

d.   The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

e.   The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

157.   18 U.S.C. 1591 § (e)(3) defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person."

158.   Defendant HANDELMAN knowingly, in or affecting interstate and foreign commerce, solicited, recruited, enticed, harbored and/or obtained Plaintiff knowing the fact that his means of force, threats of force, and coercion would be used to cause Plaintiff to engage in a commercial sex act.

159.   Defendant HANDELMAN and Plaintiff traveled for his business to Washington D.C.

160.   Defendant HANDELMAN paid for Plaintiff's trip to Washington D.C., knowing that he would use fraud, physical force and/or coercion on Plaintiff in order to engage in sexual acts with Plaintiff.

161.   Defendant HANDELMAN arranged for Plaintiff to accompany him on this business trip in order to bring Plaintiff to a hotel where he could engage in sexual acts with Plaintiff.

162.   Plaintiff did not wish to engage in sexual acts with Defendant HANDELMAN.

163.    Plaintiff's position with Defendants was of significant commercial value to Defendant HANDELMAN.

164.    Defendant HANDELMAN was well aware that Plaintiff's maintaining a position at the Crime Report or the exercise of his influence on Plaintiff's professional reputation, was of significant commercial value to Plaintiff, and Defendant used this, or the prospective use of his influence on Plaintiff's professional reputation, to recruit and entice Plaintiff into engaging in sexual acts and intercourse with him.

165.    As a direct and proximate result of these malicious and conscious wrongful actions, Plaintiff has sustained humiliation as well as severe mental and emotional distress from the indignity to which she was subjected, which resulted in bodily injury, and damages to be determined at trial.

## INJURY AND DAMAGES

As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of her career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, physical pain, humiliation, mental anguish, suffering, inconvenience, injury to reputation, aggravation, activation, and/or exacerbation of any preexisting condition, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

## JURY DEMAND

Plaintiff demands a jury on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants jointly and severally for all available damages including but not limited to emotional distress, lost wages,

back pay, front pay, punitive damages, statutory damages, attorneys' fees, costs, medical expenses, interest and all other damages as are just and proper to remedy Defendants' unlawful employment practices.

Dated:  New York, New York
            November 8, 2022

                                        Respectfully submitted,

                                        DEREK SMITH LAW GROUP, PLLC

                                        By   /s/ Melissa Mendoza
                                        _____
                                        Melissa Mendoza, Esq.
                                        *Attorneys for Plaintiff*
                                        One Penn Plaza, Suite 4905
                                        New York, New York 10119
                                        Tel.: (212) 587-0760